# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

## IN ADMIRALTY

In the matter of the Complaint of
**BACKCOUNTRY OUTFITTERS, INC.**, a Florida
corporation, as owner of a 2002 22' Cape Horn
motor vessel named Backcountry bearing
Hull Identification No. FAB22047E202, for Exoneration
from or Limitation of Liability,

                    **Petitioner,**

                                       **Case No. 3:06cv234/MCR/MD**

**LARRY MCFERREN,**

                    **Claimant,**

**vs.**

**BACKCOUNTRY OUTFITTERS, INC., et al.,**

                    **Petitioner/Defendant.**

_____/

## O R D E R

Pending is the petition filed by Backcountry Outfitters, Inc. ("Backcountry Outfitters" or "petitioner") seeking exoneration from or limitation of liability in connection with a November 2005 boating accident involving petitioner's motor vessel <u>Backcountry</u> in which passenger Larry McFerren ("McFerren") suffered personal injuries.[1]  In response to the

---

[1] Backcountry Outfitters filed this action on May 25, 2006, pursuant to the Limitation of Liability Act ("the Act"), 46 U.S.C. § 181, <u>et seq.</u>, and Federal Rule of Procedure F of the Supplemental Rules for Certain Admiralty and Maritime Claims.  In November 2006 the Act was recodified as 46 U.S.C. § 30501, <u>et seq.</u>

court's notice, McFerren filed a claim for damages.[2]  The court conducted a two-day bench trial in this matter on June 20-21, 2007.  Having considered the evidence and testimony presented at trial, as well as the parties' written closing arguments, the court concludes that the Backcountry Outfitters' petition should be denied as to the request for exoneration but granted as to the request for limitation of liability.

### Federal Rule of Civil Procedure 52[3]

Under  Rule 52(c), the court not only determines matters of law but it also decides matters of fact. See United States v. $242.484.00, 389 F.3d 1149, 1172 (11th Cir. 2004). Accordingly, the court may resolve conflicts in the evidence and make credibility determinations. See Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1504 (11th Cir. 1993); Stearns v. Beckman Instruments, Inc., 737 F.2d 1565, 1568 (Fed. Cir. 1984). Rule 52(a) requires a district court sitting without a jury to make findings of fact and conclusions of law and to do so with enough specificity for a reviewing court to identify those factual findings upon which the court's legal conclusions are based.  See Feazell v. Tropicana Products, Inc., 819 F.2d 1036, 1041-42 (11th Cir. 1987).  The rule does not, however, require the court to make a finding on every contention raised by the parties.  Id. The court should "evaluate the evidence without making special inferences in the plaintiff's favor . . . and [should] resolve the case on the basis of preponderance of the evidence."

---

[2]  On May 26, 2006, McFerren filed a state court action that also pertained to the November 7, 2005, accident.  On May 30, 2007, this court entered an order approving petitioner's stipulation for value and enjoining McFerren's state court action. McFerren, and his wife Beverly McFerren, subsequently filed claims against Backcountry Outfitters in the instant action. The McFerrens also brought a third-party complaint naming as defendant  the captain of the Backcountry at the time of the accident, Jason Dudley.  As to both Backcountry Outfitters and Jason Dudley the McFerrens sought judgment in their favor, including costs of litigation and attorneys' fees.

Beverly McFerren's sole claim has been voluntarily dismissed and she therefore no longer is a party to this action.  Pursuant to the parties' agreement, Dudley also no longer is a party, having been dismissed from the case with prejudice by the parties' stipulation; McFerren's third party complaint against Jason Dudley therefore shall be dismissed as moot. The parties have also stipulated to having the "entire matter . . . as to exoneration, limitation, and damages" resolved in this forum.

[3]  According to the Note to Fed.R.Civ.P. 52, 2007 Amendment, Rule 52 was amended effective December 1, 2007, as part of the "general restyling of the Civil Rules to make them more easily understood." The changes to Rule 52 are "intended to be stylistic only."

Emerson Electric Co. v. Farmer, 427 F.2d 1082, 1086 (5th Cir. 1970)[4]; Grant v. Bullock Board of Education, 895 F.Supp. 1506, 1509 (M.D.Ala. 1995).

In accordance with the requirements of Rule 52, the court enters the following findings of fact and conclusions of law.

### Findings of Fact

1.      Paul and Cathi Wagner own Backcountry Outfitters, a Florida corporation that charters fishing boats in the Destin, Florida, area.   In November 2005 Backcountry Outfitters owned the 2002 22' Cape Horn motor vessel known as Backcountry that bears hull identification No. FAB22047E202.

2.      In April 2003, at the age of eighteen years, Jason Dudley ("Dudley") was granted a U.S. Coast Guard OUPV [operator of uninspected passenger vessel] license that permits him to serve as captain on vessels that carry up to six passengers and operate within one hundred miles of land.  To obtain this license Dudley was required to pass a U.S. Coast Guard examination that tests for, among other things, operating a vessel in restricted visibility.  Dudley was also required to attend sea school, where he studied and was also tested on operating a vessel under restricted visibility conditions.

3.      In March 2004 Backcountry Outfitters hired Dudley to serve as a chartered fishing boat captain.  Prior to hiring Dudley, Paul Wagner took several orientation trips with him and found Dudley's ability to captain Backcountry Outfitter's fishing vessels satisfactory. The Wagners also knew that Dudley had previously owned a charter boat service and that despite his relative youth he had extensive boating experience and familiarity with Choctawhatchee Bay, where Backcountry Outfitters primarily operates.  As of November 2005 Dudley had safely run approximately one hundred fifty to two hundred charters for Backcountry Outfitters in various weather conditions, including restricted visibility. Backcountry Outfitters experienced no problems with Dudley during his employment and received no complaints regarding his competence as a captain.

4.      Cathi and Paul Wagner are Backcountry Outfitters' managing agents or supervisory

---

[4] Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

employees.  Dudley had no managing or supervisory authority within the Backcountry Outfitters' organization.

5.      Backcountry Outfitters did not formally test Dudley's skills or knowledge nor provide him with safety or navigational training  beyond that which Dudley received at sea school or in connection with obtaining his U.S. Coast Guard license.

6.      As of November 2005 Dudley required neither additional certification from the U.S. Coast Guard nor testing and training from Backcountry Outfitters in safety and navigation in order to captain Backcountry on chartered bay and in-shore fishing trips in the Choctawhatchee Bay area, including under restricted visibility conditions.

7.      On November 7, 2005, Backcountry was outfitted with all safety equipment that was required by the U.S. States Coast Guard for bay and in-shore use.  The vessel did not carry, and was not required to carry, charts, radar, GPS, or GPS with a chart plotter, and it suffered from no mechanical defects.

8.      On November 7, 2005, Backcountry was a seaworthy vessel, with respect both to the equipment onboard and the training of its master, Dudley, for its intended use of bay and in-shore fishing trips in the Choctawhatchee Bay area.

9.      At approximately 7:15 a.m. on the morning of November 7, 2005, Backcountry, piloted by Dudley with McFerren and his friends Kent Bundy ("Bundy") and Kenneth Rand ("Rand") aboard, departed a marina in Destin Harbor for a chartered half-day fishing trip in the Choctawhatchee Bay area.  McFerren and Rand were experienced boaters and had taken a chartered fishing trip with Dudley five weeks previously and thus were familiar with Backcountry; Bundy was not an experienced boat.

10.     The Wagners were not onboard Backcountry when it left for the fishing trip but Cathi Wagner was present at the marina.

11.     Patchy fog was present in the Destin Harbor area at the time Backcountry departed the marina, with visibility limited to approximately 200 feet.

12.     The practice of Backcountry Outfitters in November 2005 was to not permit its vessels to leave the dock if conditions were such that an island approximately 200 to 300 feet from the marina could be seen.  This was a reasonable and safe operational practice.

Despite the foggy conditions on November 7, 2005, Cathi Wagner could see the island and thus had no reason to delay or prevent Backcountry's departure.  Cathi Wagner also had no duty to advise or remind Dudley of any general safety concerns regarding the operation of a vessel in fog.

13.     Dudley was not aware of Backcountry Outfitter's practice of keeping its vessels in port if the island was not visible.  Dudley independently determined, however, that under the conditions present at 7:15 a.m. on November 7, 2005, it was safe to depart the marina.

14.     After leaving the marina Dudley drove Backcountry to Joe's Bayou to fish for bait. To reach Joe's Bayou the vessel traveled north from the marina through Destin Pass, under the East Pass Bridge into Choctawhatchee Bay, and then east.  This trip took approximately ten to fifteen minutes, in patchy and occasionally dense fog.

15.     After fishing for bait in Joe's Bayou for about ninety minutes, Dudley decided to take his clients to an area in the vicinity of the Coast Guard station to fish for redfish.

16.     The Coast Guard station is located on Okaloosa Island, to the north of the East Pass Bridge and near the Bridge's west end.  The water in front of the Coast Guard station is roughly ankle deep at thirty to forty feet from shore, knee deep at fifty to sixty feet from shore, and waist deep at one hundred to one hundred fifty feet from shore.  In deeper water in front of the station lies a passage known as the Coast Guard channel, which is approximately seven to ten feet deep and runs roughly northwest to southeast. The Coast Guard station is protected by several rock jetties that extend from the shore out into Choctawhatchee Bay.  The Coast Guard station also overlooks Crab Island, which is a large shoal or shallow sandbar where the water depth at times may be only twenty-four inches.

17.     Backcountry draws approximately eighteen inches of water.  With four passengers aboard, it is not capable of attaining a top speed of thirty-five miles per hour. Traveling at a speed of approximately twenty-two miles per hour Backcountry can reach a slow plane, at which time the vessel, fully loaded, draws approximately twelve to sixteen inches of water.  On the morning of November 7, 2005,  Backcountry needed to travel on plane across Crab Island in order  to avoid running aground.

18.     Backcountry carried a handheld global positioning system ("GPS"), which is a satellite-based navigation system, onboard on November 7, 2005.  Dudley had previously programmed the position of a fishing spot on Crab Island into his GPS to use as a navigational aide.

19.     Leaving Joe's Bayou after fishing for bait, Dudley drove Backcountry generally west/southwest, intending to cross over Crab Island and then enter the Coast Guard channel.  This was a route Dudley had traveled at least one hundred times previously.

20.     While Backcountry was enroute to the fishing spot area near the Coast Guard station, another Backcountry Outfitters captain, Brandon Wright ("Wright"), called Dudley via a cell phone.  Dudley slowed the vessel to speak with Wright, who advised him that weather conditions were clear to the south of the East Pass Bridge.  Given the dense fog in Backcountry's location at that time, Dudley decided to take his passengers to fish in the area that Wright recommended instead of the intended spot near the Coast Guard station.

21.     After speaking with Wright, Dudley resumed course, returning Backcountry to a slow plane.  Dudley's plan was to continue to cross Crab Island, turn into the Coast Guard channel, follow the channel to Destin Pass, and then take Destin Pass to the south side of the East Pass Bridge.

22.     Upon leaving Joe's Bayou McFerren had been seated in the front of the boat.  Rand stood to the right of Dudley, and Bundy was located in the rear of the vessel.  When Dudley reduced the speed of Backcountry to speak with Wright, McFerren moved nearer the stern to talk with Bundy.  The two men stood against a "leaning post" side-by-side, facing aft, with their feet braced against part of the boat's rear deck or a cooler.  McFerren was located near the starboard side of the boat, with Bundy standing to his right.

23.     As Backcountry traveled in the vicinity of Crab Island the fog was dense, limiting visibility to approximately forty feet.

24.     Driving Backcountry on plane at a speed of twenty-two to thirty miles per hour, Dudley looked down at his GPS to confirm his location in relation to his programmed waypoint.  When he looked up he realized that the vessel was rapidly approaching the jetties and shoreline.  Dudley immediately, and without warning, executed an extremely

sharp turn to the left in an avoidance maneuver.

25.     When Dudley resumed course after speaking with Wright, Rand had been holding onto a bar with one hand as he stood near the center of the boat with Dudley.  As the vessel turned, Rand grabbed another handhold.  He was swung around to the right by the force of the turn but managed to maintain his footing.  Bundy, in the rear of the boat, briefly grabbed a handhold but the torque created by the sharp turn wrenched his hand free.  At the time of the turn McFerren either was not grasping a handhold or had no firm grip on one.  Forces generated by the sharp turn, which were especially severe towards the rear of the boat, caused McFerren and Bundy to be "launched," or ejected violently, over the starboard side of the vessel.  The men landed approximately twenty feet from each other in waist-deep water.  At this point the vessel was about one hundred to one hundred fifty feet from shore, slightly past the Coast Guard channel.

26.     Bundy was thrown clear of Backcountry and was not injured. McFerren struck the side of the vessel as he was being ejected and suffered serious bodily injuries.  The time was approximately 9:20 a.m.

27.     Backcountry did not run aground, allide with any other object, or collide with any other vessel at the time of the accident.

28.     Due to his injuries McFerren was unable to pull himself or to be pulled back into the vessel so Bundy helped McFerren to perch on the vessel's bow.  Dudley then motored the boat at idle speed directly to the nearby Coast Guard station to seek emergency assistance for McFerren.

29.     After arriving at the Coast Guard station McFerren was transported via ambulance to Fort Walton Beach Medical Center, where he was hospitalized for seven days and treated for multiple fractured ribs, a spleen rupture, a lacerated kidney, and internal bleeding.  At the time of the accident, during the seven days of his hospitalization, and in the weeks following while he recuperated McFerren experienced severe pain.

30.     McFerren recovered from his physical injuries sufficiently within approximately four months to engage in land-clearing activities but continues to complain of reduced energy and endurance as well as premature aging resulting from the November 7, 2005, accident.

31.    Medical expenses related to McFerren's injuries for hospital and follow-up care totaled $49,700.73.   The preponderance of the evidence supports an award of that amount for medical costs.

32.    McFerren also asserts damages for past and future pain and suffering and loss of enjoyment of life in the amount of $250,000.  In light of McFerren's testimony that he was able to take part in strenuous physical activity within four months of the accident and the absence of evidence that he will experience other than minor pain or suffering or loss of enjoyment of life in the future, the preponderance of the evidence does not support an award of that amount.  Even taking into account the evidence suggesting McFerren may require additional follow-up diagnostic work related to the injury to his kidney, the evidence at most supports an award of $100,000.

33.    Officer Shelby Williams from the Florida Wildlife Commission interviewed Dudley approximately one to two hours after the accident occurred.  Williams testified that Dudley reported his speed at the time of the accident as being between ten and twenty miles per hour on a slow plane.  According to Williams, Dudley told him that he had looked down to check his GPS; when he looked up he saw the Coast Guard jetties and made an abrupt turn to avoid them.  Williams issued Dudley a citation for careless operation of the vessel, on the basis of operator inattention.

34.    Throughout the November 7, 2005, trip Dudley acted as his own look-out.  Also, all operational decisions made onboard Backcountry on November 7, 2005, regarding the boat's speed, course, destination, etc., were made independently by Dudley and without the knowledge or oversight of Backcountry Outfitters.

35.    In operating Backcountry on November 7, 2005, Dudley was subject to the Inland Navigational Rules, codified at 33 U.S.C. §§ 2001-73.

36.    Rule 3, 33 U.S.C. § 2003(k), defines restricted visibility as any condition in which visibility is restricted by fog, mist, falling snow, heavy rainstorms, sandstorms or any other similar causes.

37.    Rule 5, 33 U.S.C. § 2005, requires that every vessel shall at all times maintain a proper look-out.

38.     Rule 6, 33 U.S.C. § 2006, states that every vessel shall proceed at a safe speed so that it can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.  In determining a safe speed such factors as the state of visibility, the state of wind, sea, and current, and the proximity of navigational hazards, and the draft in relation to the available depth of water, shall be taken into account.

39.     Rule 19, 33 U.S.C. § 2019(b), requires that every vessel shall proceed in a safe speed adapted to the prevailing circumstances and conditions of restricted visibility. Dudley understood this rule only to mean that the vessel should "go slow" in fog and acknowledged that he was not "go[ing] slow" at the time of the accident.

40.     Dudley's operation of Backcountry – including motoring over Crab Island at a speed of between twenty-two and thirty miles per hour headed towards the nearby shoreline and jetties with visibility restricted to approximately forty feet, looking down to consult his GPS, and then turning the vessel sharply and abruptly without warning – was unsafe.

41.     Dudley's unsafe operation of Backcountry caused McFerren and Bundy to be thrown from the vessel and resulted in serious bodily harm to McFerren.

42.     On November 7, 2005, Dudley failed to provide safety instructions to his passengers or direct them where or how to sit on Backcountry.

43.     Due to the extreme forces generated by Dudley's abrupt turn of Backcountry at a speed of from twenty-two to thirty miles per hour, from McFerren's position towards the stern of the vessel McFerren would have been ejected and injured regardless whether he had been facing forward or gripping the vessel tightly during the turn.  Accordingly, McFerren's acts and/or omissions did not contribute to or cause his ejection from the vessel or his injuries.

###       Conclusions of Law

1.     The court has subject matter jurisdiction in admiralty pursuant to 28 U.S.C. §1333(1) over Backcountry Outfitters' petition for exoneration or limitation of liability filed pursuant to the Limitation of Liability Act ("the Act"), 46 U.S.C. § 181, et seq., and Federal Rule of Procedure  F of the Supplemental Rules for Certain Admiralty and Maritime Claims, and

McFerren's claim for damages.   The court has <u>in personam</u> jurisdiction over the parties and <u>in rem</u> jurisdiction over <u>Backcountry</u>.  Venue is proper in this district.

2.      The amount of McFerren's just claim for medical expenses is $49,700.73.  The amount of his just claim for past and future pain and suffering and loss of enjoyment of life is $100,000.

3.      A vessel owner seeking exoneration from liability must show by a preponderance of the evidence that it, its vessel, and its crew are completely free of fault. <u>American Dredging Co.</u>, 81 F.3d at 129 (stating that  "[a] shipowner is entitled to exoneration from all liability for a maritime [casualty] only when it demonstrates that it is free from any contributory fault."); <u>Hercules Carriers, Inc. v. Claimant State of Florida</u>, 768 F.2d 1558, 1564, 1582 (11th Cir. 1985).

4.      A denial of exoneration does not necessarily preclude a finding that the petitioner is entitled to a limitation of liability. The petitioner is entitled to limitation if it can prove that the loss occurred without its privity or knowledge.  In assessing whether the owner of a vessel is entitled to limitation of liability the court must determine: (1) "what acts of negligence or conditions of unseaworthiness caused the accident" and (2) "whether the ship owner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." <u>Keys Jet Ski, Inc. v. Kays</u>, 893 F.2d 1225, 1230 (11th Cir. 1990) (citation omitted); <u>see</u> 46 U.S.C. § 30505(a) (providing that "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight"); § 30505(b) (providing that, in order to be subject to limitation, claims must arise from an act that is undertaken "without the privity or knowledge of the owner"). The claimant "bear[s] the initial burden of establishing liability, and the shipowner then bears the burden of establishing the lack of privity or knowledge." <u>Beiswenger Enterprises Corp. v. Carletta</u>, 86 F.3d 1032, 1036 (11th Cir. 1996).

5.      Certain presumptions may arise from the violation of navigational rules.  Under the <u>Pennsylvania</u> Rule, if a vessel is involved in a collision as a result of a statutory violation intended to prevent collisions, then the burden of establishing liability shifts to the "vessel in derogation of a statutory rule" to show that this violation could not have been a cause

of the accident.  See The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873); Superior Const. Co., Inc. v. Brock, 445 F.3d 1334, 1340 (11th Cir. 2006). The Pennsylvania Rule has been expanded beyond collision cases to apply to any "statutory violator who is a party to maritime accident." Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1472 (5th Cir. 1991) (citation omitted); Complaint of Nautilus Motor Tanker Co., Ltd., 85 F.3d 105, 113 (3d Cir. 1996); see also United States v. Nassau Marine Corp., 778 F.2d 1111, 1116 (5th Cir. 1985) ("The [Pennsylvania] Rule does not apply only to collisions"). The Pennsylvania Rule "is not a rule of liability" but rather merely "shifts the burden of proof as to causation." Superior Const. Co., 445 F.3d at 1344 (citing Orange Beach Water, Sewer & Fire Prot. Auth. v. M/V Alva, 680 F.2d 1374, 1381 (11th Cir. 1982)).

6.      The presumption of the Pennsylvania Rule is applicable if there is (1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation involved marine safety or navigation; and (3) the injury suffered was of a nature that the statute or regulation was intended to prevent. Nassau Marine, 778 F.2d at 1116-1117. If each of these criteria is satisfied, the presumption arises that a statutory violation of a defendant caused, or at least contributed to, the injury or damage complained of.

7.      A statutory violator may rebut the presumption of the Rule by making a clear and convincing showing that the violation could not have been a proximate cause of the accident.  Cliffs-Neddrill v. M/T Rich Duke, 947 F.2d 83, 86 (3d Cir. 1991); Trinidad Corp. v. S.S. Keiyoh Maru, 845 F.2d 818, 825 (9th Cir. 1988).  The Pennsylvania Rule presumption may also be rebutted by demonstrating that the accident would have occurred despite the statutory violation. See e.g., Folkstone Maritime v. CSX Corporation, 64 F.3d 1037, 1047 (7th Cir. 1995).

8.      A preponderance of the evidence in this case supports the finding that Dudley violated Rules 5, 6, and 19 of the Inland Rules of Navigation while operating Backcountry at the time of the accident on November 7, 2005, that the Rules violated involved marine safety or navigation, and that the accident which resulted in McFerren's being thrown from the vessel and injured was the type of harm the Rules were intended to prevent.

a.      Rule 6.  Dudley failed to maintain a proper look-out in the dense fog when he looked down to consult his GPS as he was crossing Crab Island, just prior to making the turn that threw McFerren and Bundy overboard.

b.      Rules and 19.  Dudley's speed from twenty-two to thirty miles per hour was not a safe speed at the time of the accident given the dense fog and the proximity of the shore and the jetties.

9.      Under the <u>Pennsylvania</u> Rule, Dudley's violations of the Inland Rules at the time McFerren was ejected from the vessel and injured result in the presumption that Dudley was negligent and caused the accident.

10.     Backcountry Outfitters has failed to rebut the presumption of the <u>Pennsylvania</u> Rule with clear and convincing evidence showing that the violations could not have been a proximate cause of the accident.  <u>Cliffs-Neddrill</u>, 947 F.2d at 86; <u>Trinidad Corp.</u>, 845 F.2d at 825.  Nor has Backcountry Outfitters shown that the accident would have occurred despite the statutory violations. <u>See</u> Folkstone Maritime, 64 F.3d at 1047.  To the contrary, the evidence supports the conclusion that the look-out and speed violations were the proximate cause of the accident that resulted in the injuries to McFerren and that the accident would not have occurred absent the violations.

11.     Under maritime law, the elements of negligence are generally the same as a common law negligence action. <u>See</u> <u>Pearce v. United States</u>, 261 F.3d 643, 647-48 (6th Cir. 2001); 1 Thomas J. Schoenbaum, Admiralty & Maritime Law § 5-2 at 183 (4th ed. 2004).  Even if the <u>Pennsylvania</u> Rule were not applicable in this case,  McFerren has shown by a preponderance of the evidence that Dudley was negligent:  Dudley owed McFerren a duty of care while serving as captain on the fishing charter, Dudley breached this duty by operating the boat inattentively and at an unsafe speed, Dudley's acts and omissions caused McFerren to be thrown from the vessel, and McFerren suffered severe injuries as a result.

12.     McFerren has not shown that on November 7, 2005, <u>Backcountry</u> was unseaworthy, either with regard to its equipment or Dudley's training.

13.     Due to Dudley's negligent operation of <u>Backcountry</u> at the time of the November

7, 2005, accident that injured McFerren, Backcounty Outfitters cannot show it is without fault.  Backcountry Outfitters therefore is not entitled to exoneration. <u>American Dredging</u>, 81 F.3d at 129.

14.     Backcountry Outfitters bears the burden of proving, by a preponderance of the evidence,  lack of privity or knowledge in order to establish its entitlement to limitation of liability.  <u>American Dredging Co.</u>, 81 F.3d at 130; <u>Waterman S. S. Corp. v. Gay Cottons</u>, 414 F.2d 724, 738 (9th Cir. 1969) (indicating that because the <u>Pennsylvania</u> Rule "deals with causation, not privity or knowledge," the "ordinary rule of burden of proof – preponderance of the evidence – applies" to inquiry under § 30505(b)).

15.     Privity or knowledge generally refers to the vessel owner's personal participation in, or actual knowledge of, the specific acts of negligence that caused or contributed to the accident. <u>See</u> <u>Coryell v. Phipps</u>, 317 U.S. 406, 411, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943). Privity or knowledge includes constructive knowledge – what the vessel owner could have discovered through reasonable inquiry. <u>See</u>, <u>e.g.</u>, <u>In re Oil Spill by the AMOCO Cadiz</u>, 954 F.2d 1279, 1303 (7th Cir.1992); <u>Hercules Carriers, Inc.</u>, 768 F.2d at 1576.  A "shipowner's privity or knowledge is not measured against every fact or act regarding the accident; rather, privity or knowledge is measured against the specific negligent acts or unseaworthy conditions that actually caused or contributed to the accident." <u>Suzuki of Orange Park, Inc. v. Shubert</u>, 86 F.3d 1060, 1064 (11th Cir. 1996).

16.     Even if a finding of negligence suggests "complicity in the cause of the accident sufficient to make limitation unavailable  . . . an owner can still limit its liability in at least two situations." <u>Brister v. A.W.I., Inc.</u> 946 F.2d 350, 356 (5th Cir. 1991).   First, "'[w]here the acts of negligence result not from any lack of competence on the part of the crew, but rather are merely 'mistakes of navigation,' the shipowner is not precluded from the limitation of liability.'' <u>Id.</u> (citing <u>In re Hellenic Lines, Ltd.</u>, 813 F.2d 634, 638 (4th Cir. 1987)). In <u>Coryell</u>, 317 U.S. at 412, the Supreme Court held that "[o]ne who selects competent men . . . and who is not on notice . . . cannot be denied the benefit of . . . limitation."  <u>See also</u> <u>In re Kristie Leigh Enterprises, Inc.</u>, 72 F.3d 479, 481 (5th Cir. 1996) (noting that mistakes of navigation are not usually attributed to the shipowner for the purposes of

determining privity and knowledge); In Mac Towing, Inc. v. American Commercial Lines, 670 F.2d 543, 548 (5th Cir. 1982) (stating that "[o]rdinarily 'errors in navigation or other negligence by master or crew are not attributable to (the shipowner) for limitation purposes.'"); Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1377 n. 15 (5th Cir. 1983) (en banc) (stating that "no court has previously denied a corporate shipowner limitation of liability for a master's navigational errors at sea when the owner has exercised reasonable care in selecting the master"). See also Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty 894-95 (2d ed. 1975) ("So long as the Limitation Act is on the books, the owner will of course be entitled to limitation for events which occur during the voyage which lie beyond the possibility of his control.").   Another way in which a vessel owner may limit his liability in circumstances that otherwise might implicate its complicity in the cause of the accident is by showing that "the negligent employee is [not] sufficiently high in the corporate hierarchy to make his awareness that of the corporation." Brister, 946 F.2d at 356  (citations omitted).

17.    Backcountry Outfitters has shown by a preponderance of the evidence that Dudley did not occupy a position of any authority within the Backcountry Outfitter organization such that his negligence should be imputed to it. American Dredging Co., 81 F.3d at 130 (observing that when the vessel owner is a corporation, privity or knowledge means the privity or knowledge of a managing agent, officer, or supervisory employee).

18.    Backcountry Outfitters has demonstrated by a preponderance of the evidence that it exercised reasonable care in hiring and employing Dudley and that to the best of its knowledge – and also in fact – Dudley was a competent captain who required no additional supervision, training, or instruction in performing his assigned duties on November 7, 2005. Although on that date Dudley made navigational errors involving maintaining a proper look-out and safe speed while operating in fog over a shoal near the shoreline, Backcountry Outfitters has satisfied its burden of showing  a lack of privity or knowledge with Dudley's negligence.

19.    In connection with the accident on November 7, 2005, that injured McFerren, Backcountry Outfitters is entitled to limit its liability to the $25,000 stipulated post-casualty

value of <u>Backcountry</u>.

20.     McFerren, as the sole claimant in this case with just claims totaling $149,700.73, is entitled to disbursement of the entire limitation fund.

        Accordingly, for all of the reasons stated above, it is ORDERED:

1.     Backcountry Outfitters' petition for exoneration from or limitation of liability is DENIED in part and GRANTED in part, as follows:

        The petition is DENIED, to the extent that Backcountry Outfitters seeks exoneration of liability in connection with the November 7, 2005, boating accident at issue in this case.

        The petition is GRANTED, to the extent that Backcountry Outfitters seeks limitation of liability in connection with the aforementioned boating accident.  Liability is limited to the $25,000 stipulated post-casualty value, plus interest, of the 2002 22' Cape Horn motor vessel known as <u>Backcountry</u> that bears hull identification No. FAB22047E202.

2.     McFerren, as the sole claimant in this case, is entitled to disbursement of the entire limitation fund, upon application.

3.     McFerren's third party complaint against Jason Dudley is DISMISSED, as moot.

4.     The clerk is directed to enter judgment accordingly.

        DONE and ORDERED this 22nd day of February, 2008.

                                        s/ *M. Casey Rodgers*
                                        **M. CASEY RODGERS**
                                        **UNITED STATES DISTRICT JUDGE**